Fred L. MASON and Aileen A. Mason, Plaintiffs,

v.

NATIONAL FLOOD INSURERS ASSOCIATION and First Insurance Company of Hawaii, Limited, Defendants.

Civ. No. 71–3350.

United States District Court, D. Hawaii.

July 13, 1973.

Anthony Y. K. Kim, Conroy, Hamilton, Gibson, Nickelsen & Rush, Honolulu, Hawaii, for plaintiffs.

Roland Q. F. Thom, Cades Schutte Fleming & Wright, Honolulu, Hawaii, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PENCE, Chief Judge.

Plaintiffs brought suit to require defendant National Flood Insurers Association[1] and defendant First Insurance Company of Hawaii, Ltd., a Hawaii corporation, to indemnify plaintiffs for the expenses which plaintiffs had incurred for repairs to the patio of their home.[2]

Plaintiffs allege that the terms of the National Flood Insurance Act (Act)[3] and of their flood insurance policy cover the subject damages, since, they claim, the collapse of their patio resulted from a "direct loss by flood", as those terms are defined in the Act and policy. Further, they urge, none of the perils which are specifically excluded from coverage apply in their case.

This court, however, disagrees with plaintiffs' contentions.

### FINDINGS OF FACT[4]

Plaintiffs reside in a single-family house on the north shore of Oahu. As a part of the foundation structure of their house, on the ocean side is a concrete seawall, about 17 feet high, running approximately parallel to the beach. Between the seawall and the ground floor of their house, long after the house had been built, plaintiffs had put in a patio, a flat concrete slab which simply had been poured on top of the naturally underlying sand.

This patio slab, as well as a small unimproved area of the immediately adjoining property, collapsed about November 4, 1970, after seawater had undermined the underlying and supporting sand. Plaintiffs then had a resultant hole temporarily filled and subsequently repaired the patio, at a total cost of approximately $7500. Plaintiffs claim this loss is compensable under their flood insurance policy.

At the time that the seawall was constructed, about 18 years before the patio's collapse, the footing of the seawall was laid across and upon underlying old coral ridges and upon the sand that filled the voids between the ridges. Thus there remained areas of sand below the footing which were always subject to potential erosion that might be caused by the natural movement of the waves and tidewaters at, upon and under the base of the seawall. The evidence satisfies this court that the sand which had been supporting the patio slab was

---

1. The National Flood Insurance Association, which is located in New York City, is an association of insurers which provides flood insurance coverage and assumes financial responsibility for the payment of claims. Congress specifically provided for and encouraged associations, or pools, of insurers to participate in the flood insurance program. 42 U.S.C. §§ 4051–56, 4082 (1970), as amended (Supp.1973).

2. Jurisdiction is conferred upon this court by the National Flood Insurance Act, 42 U.S.C. § 4053 (1970).

3. 42 U.S.C. § 4001 et seq. (1970), as amended (Supp.1973).

4. The Findings of Fact and Conclusions of Law herein, adopt and include by reference all of the court's findings and conclusions stated in its oral decision of April 27, 1973, which are not inconsistent with the findings and conclusions herein.

gradually eroded and carried away through the sand-void areas beneath the footing.

Without the original underlying sand to support the concrete slab, it was only a matter of time until the otherwise unsupported patio would collapse. The slab itself hid the erosion process from view, until its collapse.

· Plaintiffs, nevertheless, contend that whether or not there was a structural defect in the seawall permitting such erosion, it was unusual wave action which caused the patio to collapse. The evidence presented, however, indicates otherwise. Even though the north shore of Oahu is generally recognized as an area of rough surf, no unusually heavy wave action occurred at about the time the patio collapsed. The highest wave during the period between November 4–6, 1970, was 4½ feet.[5] Since waves of this height or larger can be expected to occur about 108 days per year in that area, they are not in any sense unusual.[6]

Moreover, no evidence was presented to show that any other beach houses along the north shore were damaged during the relevant period, nor were any flood insurance claims other than plaintiffs' thereafter filed therefor. Damages were apparently limited to plaintiffs' patio and a small adjoining segment of their neighbors' property.

This court finds that the damages of which plaintiffs complain were caused by a structural defect of the seawall and not by any unusual wave action.

## CONCLUSIONS OF LAW

Based on the above findings of fact, this court concludes that the type of damage which occurred is not covered either by the Act or by the flood insurance policy issued by defendants.

In construing any insurance contract, this court recognized that such contracts are to be construed liberally in the insured's interest and strictly against the insurer,[7] and that where a policy specifically excludes areas from coverage, the language of such exclusions must be strictly construed against the insurer.[8] Nevertheless, in applying these principles to the case at hand, this court cannot but conclude that neither the Act nor the subject policy covers plaintiffs' losses.

Both the Act and the insurance policy insures against all "direct loss by flood." This is defined as "a general and temporary condition of partial or complete inundation of normally dry land areas from . . . (b) abnormally high tidal water or rising coastal waters resulting from severe storms, hurricanes, or tsunamis."[9]

The area in which the seawall, and particularly the seawall footing, was located certainly cannot be considered "normally dry land area." Portions of the seawall were regularly submerged with rise in the tides as well as with washing of the waves against the wall.

Further, there was no evidence to show any "inundation . . . from

---

5. The Coast Guard Station at Kilauea Point, Kauai, which monitors the height of waves reaching the north shore of Oahu, made the following ocean swell observations:

| November 4, 1970 | 8:00 A.M. | 3 feet |
| | 2:00 P.M. | 3 feet |
| November 5, 1970 | 8:00 A.M. | 0 feet |
| | 2:00 P.M. | 0 feet |
| November 6, 1970 | 8:00 A.M. | 0 feet |
| | 2:00 P.M. | 4½ feet |

Letter from Robert R. Harvey to Cades, Schutte, Fleming and Wright, December 14, 1971 (Defendant's Exhibit D–5).

6. *Ibid.*

7. *E. g.*, Aschenbrenner v. U. S. Fidelity and Guaranty Co., 292 U.S. 80, 84–85, 54 S.Ct. 590, 78 L.Ed. 1137 (1934), rehearing denied, 292 U.S. 615, 54 S.Ct. 861, 78 L.Ed. 1474 (1934); General Casualty Co. of America v. Azteca Films, Inc., 278 F.2d 161, 168 (9 Cir. 1960), cert. denied, 364 U.S. 863, 81 S.Ct. 103, 5 L.Ed.2d 85 (1960); cited with approval in American Casualty Co. v. Simpson, 413 F.2d 1042–1043 (9 Cir. 1969).

8. Stanley v. Onetta Boat Works, Inc., 431 F.2d 241, 243 (9 Cir. 1970).

9. 24 C.F.R. § 1909.1 (1972).

. . . abnormally high tidal water." "Inundation", in the context of the Act and policy, would result from rising coastal waters occasioned by severe off-shore storms, hurricanes, and tsunamis.[10] Yet no evidence of any such storms, hurricanes, or tsunamis was presented; nor, as pointed out above, were there abnormally high waves, which would have indicated their existence. Rather, as heretofore found, the damages which occurred resulted from the gradual erosion of sand through the structural defect in the seawall base. Thus, this court can only conclude that plaintiffs' losses did not result from "flood", as defined in the Act and the insurance policy.

 If more were needed, plaintiffs' losses were specifically excluded under both the Act and policy. Regulations which were issued under the Act by the Department of Housing and Urban Development specifically exclude coverage from "water or mudslide damage which results from causes on the insured's own property or within his control or from any condition which causes flooding or mudslide damage which is substantially confined to the insured premises or properties immediately adjacent thereto."[11] The policy itself is similarly clear in excluding the subject damages.[12] Since the damages which occurred in this case were confined to the plaintiffs' premises and a small segment of the immediately adjacent property, this constituted a peril which in this case clearly falls within the specific exclusion.

Let judgment be entered in defendants' favor.

---

10. *Id.* Congress apparently intended that inundation in cases of rising tidal waters must be so occasioned. *See* H.R. Rep.No.1585, 90th Cong., 2d Sess., in 2 U.S.Code Cong. & Admin.News 2965–67 (1968).

11. 24 C.F.R. § 1911.4(b) (1972).

12. Relevant segments of the policy are herein quoted: "Perils Excluded—This Company shall not be liable for loss: (a) By . . . (3), water or moisture damage of any kind resulting primarily from conditions, causes, or occurrences which are solely related to the described premises or are within the control of the Insured (including but not limited to design, structural or mechanical defects, failures, stoppages or breakages of water or sewer lines, drains, pumps, fixtures or equipment, seepage or backup of water, or hydrostatic pressure) or any condition which causes flooding which is substantially confined to the described premises or properties immediately adjacent thereto . . . . ."